[Sac. No. 4308. In Bank.—August 1, 1930.]

SEQUOIA NATIONAL PARK STAGES COMPANY (a Corporation), Respondent, v. SEQUOIA AND GENERAL GRANT NATIONAL PARKS COMPANY (a Corporation), Appellant.

Thelen & Marrin, O. K. Morton, Richard T. Eddy and Karl A. Machetanz for Appellant.

158

Gwyn H. Baker, Power & McFadzean and Power, Mc-Fadzean & Crowe for Respondent.

SEAWELL, J.—Action for injunction and damages. Judgment went for plaintiff for injunctive relief; damages disallowed. Defendant appeals.

Plaintiff corporation, as the successor of Overall and Askin, a copartnership, has since July 20, 1927, been engaged as a common carrier in the transportation of persons and property for hire by automobile over certain public highways of this state, including that portion lying between the city of Visalia and a point on or near the boundary line of Sequoia National Park known as Ash Mountain Park Headquarters and intermediate points under and by virtue of certificates of public convenience and necessity issued by the state Railroad Commission in accordance with the provisions of the Auto Stage and Truck Transportation Act, Statutes of 1917, chapter 213, page 330. The route above mentioned does not include the entire extent of plaintiff's operations. By way of complaint it is alleged that defendant is and was at all times above mentioned a corporation and has since May 20, 1926, engaged in the business of transporting persons and property as a common carrier for hire over a regular route and between fixed termini, viz., the city of Visalia and the westerly boundary line of Sequoia National Park and intermediate points, said points being upon and connected by the same highway over which plaintiff operates its autostages and in competition therewith; that defendant was not so engaged in said transportation prior to May 1, 1917, and that no certificate of public convenience and necessity has ever been issued by the state Railroad Commission authorizing defendant to engage in the business of a common carrier; that defendant is transporting persons and property at lower rates than plaintiff is allowed to charge by reason of the fares and rates as fixed by the schedule of the Railroad Commission to which plaintiff is compelled to adhere. Defendant admits that during the operating season of the Giant Forest Lodge Hotel and grounds within said Sequoia National Park, commencing May 25, 1926, and closing September 26, 1926, it operated a hotel bus solely for the transportation of its guests, patrons, employees and private

uses from the city of Visalia, its nearest railroad connection, to Giant Forest Lodge by way of Exeter; alleges that during the hotel and outing season of 1927, commencing May 25, 1927, to and including July 27, 1927—at which time it was discontinued by an injunctive order obtained at the behest of plaintiff—its only transportation operations were as a private carrier operating a hotel bus which also rendered a one-day continuous sight-seeing service between said railroad stations, to wit, Visalia and Exeter, and said Giant Forest Lodge and grounds situate within said National Park. Defendant further insists that its service is exempt from the jurisdiction of the Railroad Commission by the provisions of section 1 (c) of the Auto Stage and Truck Transportation Act, Statutes of 1917, page 330, chapter 213, as amended, and section 50¼, chapter 42, page 74, Statutes of 1927, which provide as follows:

"The term 'transportation company,' when used in this act, means every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever owning, controlling, operating or managing any automobile, jitney bus, auto truck, stage or auto stage used in the transportation of persons or property as a common carrier for compensation over any public highway in this state between fixed termini or over a regular route and not operating exclusively within the limits of an incorporated city or town or of a city and county; provided, that the term 'transportation company,' as used in this act, shall not include corporations or persons, their lessees, trustees, receivers or trustees appointed by any court whatsoever, in so far as they own, control, operate or manage taxicabs, *hotel busses or sight-seeing busses,* or any other carrier which does not come within the terms 'transportation company' as herein defined." (Italics ours.) (Sec. 1 [c], Stats. 1917, p. 330.)

"No passenger stage corporation shall hereafter operate or cause to be operated any passenger stage over any public highway in this state without first having obtained from the railroad commission a certificate declaring that public convenience and necessity require such operation, but no such certificate shall be required by any passenger stage corporation as to the fixed termini between which, or the route over which, it is actually operating in good faith at the time this

act becomes effective in compliance with the provisions of an act known as chapter 213, statutes of 1917, of the State of California, approved May 10, 1917, and amendments thereto nor shall any such certificate be required of any person or corporation who on January 1, 1927, was operating, or during the calendar year 1926 had operated a seasonal service of not less than three consecutive months' duration, sight-seeing busses on a continuous sight-seeing trip with one terminus only." (Sec. 50¼, chap. 42, Stats. 1927, p. 74.)

The defendant had operated its hotel and sight-seeing bus during the calendar year 1926 for a seasonal service of more than three months and was so operating during the year 1927 when it was stopped three days before it had operated the entire period required by law by injunction procured by plaintiff.

The General Grant and Sequoia National Parks, respectively, are, by acts of Congress, government reservations and contain vast areas of mountainous lands situate some distance easterly of the expansive valleys of Kern, Tulare and Fresno Counties and extend into the higher reaches of the Sierra Nevada range, Mt. Whitney being visible in the distance. These parks are far-famed for their ruggedness and scenic attractiveness, which includes towering peaks and cliffs, deep canyons and gorges with precipitous walls of rock, snow-fed streams, lakes, forests and flora of rare interest. Within the boundaries of said parks grow the largest trees to be found on the earth, the sequoia gigantea species, the largest of which is "General Sherman," measuring more than 279 feet in height and 36 feet in diameter at the base. Numerically thousands of mammoth trees of this family, most of which attain almost incredible heights, are grouped here and yon throughout said parks. The altitude of said park lands makes them more desirable vacation grounds during the summer seasons.

To the end that the natural wonderments and scenic beauty of the parks might be preserved in their original state and made accessible for the use and enjoyment of the public, the federal government withdrew said park lands from sale or purchase in any form, and inaugurated the policy by which said parks, remote from the larger centers of population of the nation, might be enjoyed by the public

at a minimum cost by granting to individuals or corporations certain rights and privileges of furnishing hotel and camping accommodations, supplies and entertainment to guests and patrons for compensation, extending over a period of years, the government, however, retaining and exercising supervisory control over the entire subject matter. The contract in the instant case entered into by the federal government and defendant is for a term of twenty years.

The above introduction is made in the interest of a better understanding of the relations and interests of the state and federal government and the parties in suit to the subject matter of the action and, also, as furnishing an answer to the challenge offered by respondent to the constitutionality of the exemption clause of the Auto Stage and Truck Transportation Act of 1917, page 330, as amended, and also section 50¼, chapter 42, Statutes of 1927, page 74, on the basis that the exemption of sight-seeing busses therein provided presents no distinguishing characteristic which would constitute the basis for a constitutional distinction or natural or intrinsic distinction to justify said classification and, therefore, is invalid as violative of sections 11 and 21, article I, state Constitution, and of the Fifth and Fourteenth Amendments to the federal Constitution.

For some years past it has been the policy not only of this state but of the federal government as well to provide not only highways and means of access to these national parks and playgrounds but hotel, lodge and other accommodations that the public may be maintained in comfort while there. As an aid in promoting its definite policy, the federal government has adopted the plan of making contracts with private persons and corporations to build and conduct hotels, lodges and camping places therein for the accommodation of tourists, travelers, health and recreation seekers, and the state has responded by building highways and otherwise aiding the project. The importance, as a public matter, of the object sought to be accomplished; the exceptional kind and character of service to be rendered; the remoteness of location; the sparsely settled communities through which said autobusses are required to travel in order to connect with rail and other channels of travel, and the shortness of the season in which said summer hotels and lodges, many of which are situate in the snow regions of the state, may

be kept open to the public, and doubtless, many other considerations might be urged as a sufficient reason for the exemption of hotel busses and sight-seeing motor vehicles used in that particular service from the burdens imposed upon those engaged in other kinds of transportations. ■ The reasonableness of such classifications must of necessity rest with the legislature and its decision in the premises will not be declared invalid unless it. appears to be palpably arbitrary. (*People* v. *Monterey Fish Products*, 195 Cal. 548 [38 A. L. R. 1186, 234 Pac. 398].) ■ Every presumption is in favor of the legislative act and the legislative classification will not be disturbed unless it is palpably arbitrary in its nature and neither founded upon nor supported by reason. (*In re Sutter-Butte By-Pass Assessment No. 6*, 191 Cal. 650 [218 Pac. 27].) ■ We find no substantial grounds upon which the exemption provision may be declared palpably arbitrary and therefore invalid. Many states of the Union have adopted a similar provision. Plaintiff and respondent relies upon *Franchise Motor Freight Assn.* v. *Seavey*, 196 Cal. 77 [235 Pac. 1000], as conclusive on the case at bar. There the truck operators referred to were engaged exclusively in the movement of products or implements of husbandry and other farm necessities from farm to farm or between farms and loading points. Said operators claimed that they were exempt from the necessity of obtaining certificates of public convenience and necessity by reason of the express provisions of chapter 310, Statutes of 1923, page 644, purporting to amend section 5 of the Auto Stage and Truck Transportation Act of 1917. · This court found as a fact that the exemption from regulation of said operators was a detriment, rather than a benefit to the farmers for whose supposed immediate benefit the exemption was specifically designed, as well as a detriment to the public generally, and would be of the benefit *solely to the particular class* of transportation so exempted.

No such case is presented by the facts of the instant case. The opinion, it is true, does state that if the provision was designed for the benefit of the farmers and if it may conceivably so operate, the weight of authority is to the effect that it is an unwarranted discrimination. The decision then proceeds upon, and cites cases in support of the proposition that such legislation with respect to fruits and farm prod-

ucts is in restraint of trade, and climaxes its argument with the following illustration taken from *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540 [46 L. Ed. 679, 22 Sup. Ct. Rep. 431]:

" . . . that if combinations of capital, skill or acts, in respect of the sale or purchase of goods, merchandise or commodities, whereby such combinations may for their benefit exclusively control or establish prices, are hurtful to the public interests and should be suppressed, it is impossible to perceive why like combinations in respect of agricultural products and live stock are not also hurtful."

The law as applied to the facts considered in the Franchise Motor Freight Association case does not present a situation analogous to the instant case, as the statement of this case in addition to that which has already been set forth will develop. As above noted, similar exemption provisions are to be found in the statutes of other states.

The evidence does not present any serious conflict on material questions of fact and hence the question presented is one of law alone. The three alleged violations on the part of defendant of the act under which it claims the right to operate its hotel and sight-seeing busses, which are of little significance, will later be briefly mentioned.

Since the contract made with the federal government in 1926 the defendant operated daily during the season a particular motor type eleven-passenger bus equipped and fitted for mountain traffic. Said bus served the dual capacity of a sight-seeing and hotel bus, carrying guests and tourists from two railroad stations, to wit, Visalia and Exeter, seven or eight miles apart. Both stations are on transcontinental lines of the Southern Pacific and Atchison, Topeka and Santa Fe railroads. Said stations are points at which tourists intending to visit the Sequoia or General Grant National Parks detrain for the journey by automobile transportation into said parks. The state highway leads from Visalia in an easterly and northeasterly direction by way of Exeter to its terminus at Ash Mountain Park Headquarters, the gateway to the Park, a distance of approximately forty-three miles. From the gateway to the hotel or lodge the way is over federal roads, a distance of eighteen miles. The federal government does not allow plaintiff's autostages to enter the park grounds, hence the gateway is its terminus.

Such passengers as it may carry destined for the hotel and grounds were carried by defendant from Ash Mountain Park Headquarters to the hotel, it would seem without charge. The hotel and sight-seeing bus daily left the Southern Pacific Station at Visalia at 8:35 A. M., and the Atchison, Topeka and Santa Fe Station at 8:40 A. M., and the Southern Pacific Station at Exeter at 9:30 A. M., and arrived at Giant Forest at 12:05 P. M. It left Giant Forest on the same day on its return trip at 3:55 P. M., arriving at Exeter at 6:30 P. M. and Visalia at 7 P. M. Visalia was the initial starting point. The plaintiff's stages made the same train connections. No active soliciting was done by the defendant's driver at said stations. Its bus was lettered indicating its destination. All charges, fares, rates and services proposed by the defendant are subject to the approval of the Secretary of the Interior. Its tickets were sold only by its drivers at the following prices in 1926: Sight-seeing ticket from Visalia or Exeter (railroad stations) to Giant Forest and return, the round trip to be made in one day, no stop-over or extension allowed, $11; hotel ticket and transportation from Visalia or Exeter to Giant Forest and return, including three meals and one lodging at Giant Forest, $17. The same class of ticket was sold for additional meals and lodgings at extra charge of $6 per day. The hotel charge for 1927 was reduced to $5 per day. Tickets partially used had no redemption value. Forty pounds of baggage were carried free on each ticket. A motor tour of Giant Forest with a lecturing escort left Giant Forest Lodge at 1:30 P. M., returning at 3:30 P. M. The fare charged for this trip was, four or more persons, $2 each. The sight-seeing bus, after making its trip through the park, returned to the railroad stations to connect with trains passing both ways. The sight-seeing tickets, which were sold for $11, called for one continuous trip only on the day presented.

The bus schedule was so timed as to permit connection with railroad trains arriving in the morning and departing in the evening, allowing sufficient time in the park for sightseeing. Both Visalia and Exeter were arrival and departure stations. The bus tickets carried a $5 hotel credit and each coupon was treated as $5 in cash in payment for hotel accommodations. Guests who came as bus passengers stayed

at least one night and many stayed longer. The proof shows that all coupons attached to hotel bus tickets came back through Grant Forest Lodge as accounted for in hotel service. The driver of the hotel bus was instructed to take no passengers except those who wanted either hotel bus service or sight-seeing service and had purchased the appropriate ticket for such service. The uncontradicted testimony of the driver is to the effect that he never carried one-way passengers destined for intermediate points between Visalia and Exeter or between either of said points and the park. He daily refused to carry passengers who had purchased through railroad tickets to the park by way of plaintiff's line. No through service arrangements were made by defendant with either of said railroad companies for the reason that it did not regard itself a common carrier. Defendant transported no merchandise other than its own supplies and no persons other than hotel guests and sightseers, who in each instance had purchased tickets, except its own employees.

The claim is made by plaintiff that the transportation of persons and property is the real business in which defendant is engaged and the management of the hotel lodges, camps and recreation grounds are but a secondary enterprise, in fact a subterfuge set up to obscure the true purposes of defendant. It is also contended that there is no scenery of interest along the route until the lodge is practically reached. This contention cannot be sustained upon the record before us. The whole route from Visalia may be said to be one of varying scenic interest to those who are strangers to the topography and scenery of California. It is laid through a portion of the foothill citrus fruit and vineyard lands of Tulare County in the Kaweah River district and leads with ascending grade upon the Sierra Nevada range. Between the park entrance and the lodge near by the road is located the famous Moro Rock, said to be the largest monolith of the Sierra Nevada chain, from the top of which a panoramic picture of the valleys and lowlands stretches beneath. Other points of interest are to be noted upon the map and folders of the national park, the former being published by the department of the interior and circulated by the defendant. Neither the folders and advertisements caused to be published at the

direct instance of the defendant nor the separate publications made by the overland railroads as to the mode of gaining access to the park, the circulation of which was helped by the defendant, fairly support the conclusion that either or both amount to satisfactory proof that the major business, object or purpose of the defendant was that of a common carrier or anything more than an incident to proprietorship and management of such a resort as defendant conducts. A hotel or resort dependent upon conditions as they exist at Forest Lodge which did not provide some convenient and suitable means of conveying travelers who are without the advantages of private automobile service, and their baggage, from railroad stations to its place of business in conformity with the existing custom would run the risk of losing prestige and finally its business. Because it does so is by no means proof that the transportation service is its major service unless there be proof more persuasive than has been presented in the instant case that it is guilty of bad faith. The objection or criticism that the route is not shown to be uniformly attractive throughout its entire length, if held to be sound, would put an end to sight-seeing transportation. Such routes must have a starting point and portions of the route must necessarily prove unattractive to many persons. The case as made supports but one reasonable conclusion, to wit, that the proprietors of the park by virtue of their contract with the government were engaged in conducting an hotel, lodges and camping grounds and in providing entertainment for the accommodation of the public and the bus arrangement was but a means of bringing persons to the park who had no other means of transportation.

█ We will now give brief attention to the three specific instances which plaintiff presented as indicative of the status of a common carrier. One was the case of two lady teachers of Visalia who wished to camp in the park for a few days. They understood the rate to the park and return was $11. That was true only as to a sight-seeing one-day trip. Corrected as to the fare being $16, if they did not make a one-day trip, they demurred to the hotel $5 charge, as they did not wish to take more than one or two meals there and did not desire to lodge there at all. They claimed that the driver told them the $5 hotel coupon could be used

in the purchase of supplies at the store. The lady cashier at the hotel, upon whom they made a demand for a refund after eating two meals each, said, according to the teachers themselves, that she had never heard of any such plan and the proposition was new to her. The insistence by the ladies for a refund seemed to have caused some embarrassment to the management, but the matter was finally settled by a refund of $2.50 being made to each of said ladies. They remained in camp about a week and were patrons of the store. The driver of the stage testified that he had no recollection of telling anyone that the $5 hotel coupon would be honored at the company's store, as it was contrary to his instructions and that he told everyone alike that the coupon was good "down at the lodge for three meals and a night's lodging." The next complaint involves the carrying of a few packages of meat on two or three occasions as a matter of accommodation after the plaintiff's stage had departed from Visalia to Lemon Cove, for which no charge was made. The third and last was the circumstance of a citizen of Lemon Cove who took passage on a sight-seeing bus at Visalia July 23, 1927, at about the time the complaint herein was filed. He testified that he went to the park to arrange for taking his family up later. He traveled on a sight-seeing ticket and returned the same day, but left the stage at Lemon Cove, although his ticket entitled him to a through ride to Visalia, the starting point. He was told at the lodge, upon inquiry, that his ticket would not be good for return passage the following day. The three specific acts above related constitute the sum total of this class of alleged infractions and are too trivial to receive serious consideration. Viewed from the angle most favorable to plaintiff's case, they would not be sufficient to establish a system or design on the part of defendant to operate as a common carrier by fraudulent practices. They are such acts as may infrequently occur notwithstanding the most scrupulous preventive efforts on the part of the management. It would be giving an overstrict, if not a harsh, construction to circumstances of doubtful probative value to hold them sufficient to constitute a forfeiture of rights otherwise accrued under the statute. The fact that plaintiff wrongfully procured an injunction order preventing defendant from further operating its bus for the full statutory period

of three months, three days prior to the expiration of said period, cannot be regarded as conferring an advantage upon plaintiff to the prejudice of defendant. Defendant was able, willing and ready to and would have complied with the statute had it not been stopped by the legal machinery set in motion by plaintiff.

It would appear from a reading of the statutes under which defendant asserted the right to operate its bus that it was clearly within the letter and intent of said acts. Its bus was kept overnight at Visalia, its initial starting point. It stopped at another near-by railroad station, Exeter, to take on guests or sightseers and made no other intermediate stop until it arrived at the park entrance. Its trip was continuous, stopping but a few hours at the lodge where the hotel guests were discharged and the sightseers were given an opportunity to rest for a time, eat lunch and were returned on the same day in time to connect with out-bound trains. It would be a technical and a too narrow construction to hold that this situation is not reasonably within the purview of said statutes.

The operation of sight-seeing busses is common in various parts of the state, especially in the southern part of the state, where trips extend to the beach resorts and to places of amusement and recreation. It is, therefore, not a new or novel question with the Railroad Commission. The facts presented by the instant case are strikingly analogous to the facts underlying *Motor Transit Co.* v. *Snell,* 23 Opinions and Orders of the Railroad Commission, 641, except that the instant case presents stronger reasons for exemption than appear in the case passed upon by the Railroad Commission. The facts as found by the commission, the primary body created by the Constitution to hear and determine questions of the kind presented by this proceeding, were that Snell operated a through trip excursion from Los Angeles to any resort selected by the patron in the San Bernardino mountains. Coupon tickets were issued covering the round-trip transportation and meals en route and lodging or hotel accommodations at Big Bear Valley points for such periods as might be desired by passengers and in all cases covering at least one night's accommodation. The price of the trip varied as to the particular resort and length of stay thereat desired by his patrons. Defendant

transported no patrons without tickets and the transportation received therefor always included the value of meals en route and resort or camp accommodations. No transportation of passengers from Los Angeles to San Bernardino mountain points, or in the reverse direction, was ever made, patrons in all instances purchasing tickets for the full round trip, including meals and resort or camp accommodations. No local passengers were transported unless they held tickets with coupons thereon for meals and resort accommodations. The commission found from the above state of facts that the defendant had not been engaged in the business of a transportation company "as defined by paragraph (c) of section 1 of chapter 213, Statutes of 1917, page 330, as amended, in that all service rendered to his patrons has covered a touring trip in which meals and accommodations have been furnished as a portion of the items included in the value of the ticket; that no transportation had been furnished unless patrons purchased tickets for the entire trip, including meals and accommodations; and that defendant in good faith has furnished the character of trip offered to his patrons and has assumed the cost of meals and accommodations which were furnished patrons using his service." The conclusion was that the operation of defendant as complained of was not that of a transportation company as defined by the statute and the complaint was dismissed. Had said commission laid hands upon the instant case before complaint was filed in the superior court of Tulare County there can be but little doubt that its decision would have been the same as ours.

 It has frequently been observed by courts that all private business partakes of the aspect of a public enterprise, but that circumstance alone does not convert a private business into a public business. *Frost v. Railroad Commission,* 271 U. S. 583 [47 A. L. R. 457, 70 L. Ed. 1101, 46 Sup. Ct. Rep. 605], considers at length the power of the state to compel a private carrier to assume against his will the duties and burdens of a common carrier and holds that the state does not possess such power. If the defendant should be required to conform to the burden of a common carrier in order to serve its private business enterprise by meeting trains to transport its patrons to its place of business, its livelihood would, to say the least, be

seriously impaired. Doubtless it is for this reason that hotel and sight-seeing busses were exempted by the provisions of the Statutes of 1927. The same vehicle was used in dual service, which is not prohibited, and was owned, controlled and managed by the corporation for whose use it was employed. A number of findings are attacked by appellant as being either conclusions of law or unsupported by the evidence. While a number of them may be subject to such criticisms as made by appellant, we would not deem them sufficient of themselves to justify a reversal if the main finding, No. 6, which contains the crux of the case, could be sustained by the evidence. We have read the entire record, including the transcript of the testimony, and are of the view that the exemptions provided by the statutes are valid and effective.

It appears that after the complaint was filed in the superior court on July 23, 1927, a similar proceeding was commenced on February 7, 1928, before the state Railroad Commission. The matter was heard by the commission, a tribunal especially empowered to conduct such a proceeding, but no decision was rendered by reason of the pendency of this proceeding in the superior court. No question is raised as to the superior court's jurisdiction by either party and we are not called upon to enter into a discussion of the subject. No other questions require special consideration.

Judgment reversed.

Shenk, J., Richards, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.